## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 20 2018, 6:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Philip R. Skodinski
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joshua Walker,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | December 20, 2018<br><br>Court of Appeals Case No.<br>18A-CR-1140<br><br>Appeal from the St. Joseph<br>Superior Court<br><br>The Honorable Jane Woodward<br>Miller, Judge<br><br>Trial Court Cause No.<br>71D01-1611-MR-8 |

**Brown, Judge.**

[1] Joshua Walker appeals his conviction for murder. Walker raises one issue which we revise and restate as whether the trial court abused its discretion in not instructing the jury as to the offenses of voluntary manslaughter, involuntary manslaughter, and reckless homicide. We affirm.

## Facts and Procedural History

[2] In November 2016, Walker lived with Ronald Bacsa and Lonnie White in a house in South Bend, Indiana. On the morning of November 7, 2016, Walker was in a bedroom after not having slept all night and "was a little bit irritable and frustrated from working" for his landlord, and Bacsa, who was stumbling and appeared to Walker to be intoxicated, said "You S.O.B." as he walked past the bedroom to the bathroom. Transcript Volume 1 at 119-220. Bacsa exited the bathroom, went into the living room, sat on a green chair and began to watch television, and at some point "hollered out, 'F--- you, go to hell,' real loud." *Id*. at 220. At that point, Walker "stormed in the living room and pushed [Bacsa] down out of the chair." *Id*. at 221. Walker was upset with Bacsa for being intoxicated and had been upset with him for his hygiene. While Bacsa was on the floor, Walker "stomped him with [his] heel on the right side of [Bacsa's] face and the back of [Bacsa's] head hit off of the floor." *Id*. at 224. After that, Walker "tried to refrain," "backed off for a minute," and "tried to refrain from harming him," but "that's when [he] decided [to] pick up the chair." *Id*. Walker then picked up the green chair which had a metal frame, pulled it off of its base, and threw the chair on Bacsa, who was unconscious. Walker then picked up the green chair and set it aside, grabbed a wooden chair,

and "smacked" Bacsa in the lower back with it. *Id*. at 226. Using his foot, Walker again "stomped" on Bacsa between his waist and lower rib cage. *Id*. Walker "pick[ed] [his] knee up in alignment . . . straight up and down and brought [his] foot down on [Bacsa's] side." *Id*. at 227. Walker was outraged and went into the bathroom and turned on the bath water, returned to the living room and removed Bacsa's clothing with the intention of moving him into the bathtub, grabbed Bacsa by his hair, and hit him "quite hard" with the palm of his hand at least four or five times on the side of the head and mouth. *Id*. at 228. Walker dragged Bacsa by his ankles into the bathroom, tried to lift him but could not, and left him on the floor. Walker smoked a cigarette, left the house, and walked to a church and had breakfast.

[3] At some point, White arrived home and discovered the naked Bacsa on the floor of the bathroom and went to a neighbor's house to ask the neighbor to call the police. Paramedics arrived and discovered that Bacsa was dead and cold to the touch, and had a significant blunt force injury to his head. When Walker arrived home, he approached law enforcement officers standing in the street outside the house and said, "I'm the suspect and he's the victim," and pointed to the house. *Id*. at 42. DNA testing revealed that blood found on the green and wooden chairs was consistent with Bacsa's DNA. Bacsa suffered numerous fractured ribs, a punctured lung, and bleeding around his brain and his death was caused by the blunt force trauma injuries.

[4] On November 9, 2016, the State charged Walker with the murder of Bacsa. At the jury trial, White testified that Bacsa was an alcoholic. Walker's mother

testified that Walker experienced a psychotic break during his senior year of high school in 1997, was placed on medications, and was hospitalized again the following year. She testified Walker was treated for schizophrenia, there were times he was very paranoid, and he was a patient at Madison Center until it closed in 2010 and later at Oaklawn. She stated that he was at Madison Manor for about twenty-two months in a very structured environment.

[5] Walker testified that he was hospitalized in 2015, had not been eating properly, was taking an antipsychotic medication, and that "I was functioning okay. It was just sometimes the anger and the disappointment in myself and the, ah, rebellious type of attitude, you know, sometimes having, what I have, and, ah, just, ah, was having difficulties." *Id*. at 208. Walker further testified that he attacked Bacsa. When asked "[w]hy did you do that," Walker answered that he was "pretty well angry and aggravated and out of control" and "[i]t was just the fact that he was, ah, possibly, it's the intoxication part of it, I mean, I've been a little bit upset with him and prior to this happening with his hygiene and his alcohol and just kind of putting up with, just putting up with him on a daily basis." *Id*. at 221-222. When asked if Bacsa said anything to him when he stormed into the living room, Walker replied "He wasn't really paying too much attention. He was still in the process of, he, he claims he communicates with his relatives that are dead and gone," "He has hallucinations and delusion and, ah, he, apparently, talks to himself, or talks out loud. So, I believe that's what he was doing," and "He does this often, but at times I just ignore it because I know that's his problem, but at this, particular time, I just lost control

of myself." *Id*. at 223-224. Walker testified that he pushed Bacsa out of the chair and "[t]hat's when I lifted my foot and my leg up and stomped him with my heel on the right side of his face and the back of his head hit off of the floor." *Id*. at 224.

[6] When asked "[w]ell, after you did that to him, why didn't you just go back to your bedroom," he replied "I tried to refrain. I backed off for a minute. I didn't want to hurt him and at the time I thought, you know, I tried to refrain from harming him. But that's when I decided, you know, pick up, pick up the chair." *Id*. When asked "[w]hen you say you tried to refrain, why didn't you just refrain," he answered "I did try, I mean, something in me that told me to back off and leave him the way he was there on the floor, evidently, it just, I continued, continued to assault him, attack him." *Id*. at 224-225. Walker testified that "I necessarily picked [the green chair] up and, kind of, ah, dropped it down on him. I didn't necessarily throw it from a high point, I, basically, took some force and used my arms into it." *Id*. at 225. He testified he set the green chair aside, grabbed the wooden chair, smacked Bacsa with it, and then using his foot "stomped him in his left-hand side in, like, I don't know, what's there, the kidneys, or whatnot, in the side the lung area." *Id*. at 226.

[7] When asked "when you were doing that stuff to him, were you trying to kill him," Walker answered "I believe, that I was trying to harm him, and I, necessarily, I, it wasn't, like, I did want to harm him. But I know that I was harming him and, um, I don't know if I really intended, like they say, intended, or knowingly, you know, wanted to do this, but evidently, I, I guess, that's the

right term." *Id*. at 235. When asked "you haven't had any delusions then, right," he answered "No. I was functioning alright. I was taking my medication; my antipsychotic, I was taking. . . . So, at the time, I was functioning okay. It was just, me, and [the landlord] and the circumstances I was living in, you know, was kind of an unhealthy environment. I shouldn't even been there." *Id*. at 238.

[8] On cross-examination, when asked if he is able to know right from wrong, Walker replied "I can make them decisions, yes." *Id*. at 243. Walker indicated he was not afraid of Bacsa. When asked if Bacsa was engaged in a fight, Walker replied "No. He was minding his own business. He was directing them comments and obscenities to his, ah, evidently, he believes, he . . . talks to his relatives . . . . And he was having a little bit of a hard time that morning because of his intoxication and his alcohol level." *Id*. at 244. Walker testified "[i]t's not that I wanted to kill him, or hurt him badly. It's just because it's the situation and how it was happening, I could not stop myself, or refrain myself from harming him." *Id*. When asked "you were aware . . . about the high probability that you were killing him," he replied "Yes, I realized that; I was." *Id*. at 247-248. When asked "so, you're saying that you knowingly killed Ron Bacsa," Walker replied: "Did I knowingly, as I think about it? I'm not, like I said, good with words and description or what they mean, but, as far as, you using that term, the judge has used that term, it sounds proper." *Id*. at 250.

[9] On re-direct, when asked "[w]hen you were doing it, did you know that you were killing him," Walker replied "I believe, I possibly could have been

knowing that I was killing him, as far as, yeah, due to the fact that it was violent." Transcript Volume 2 at 4. When asked "[s]o, you were intending to kill him," he stated "I'm not necessarily sure if I was intending to kill him, but, as far as, my outrage and actions and stuff, I pretty much, I guess, along them lines, I was, you know, I don't know if I was trying to kill him. It was, basically, I was just trying to hurt him." *Id.* When asked "[w]ell, there's a difference between trying to hurt someone and trying to kill them," Walker stated "[y]eah, I know," and when asked "[s]o, what were you trying to do," he stated "[t]o be honest with you, I, I really, I can't answer that question, too, honestly, I mean, it's kind of like a 50-50, but, I mean, ah, the man, you know, did not deserve this and, I mean, ah, was I trying to kill him? No." *Id.*

[10]    Evidence was presented that two doctors who assessed Walker determined that he was able to appreciate the wrongfulness of his conduct and was not insane at the time of the offense. Walker proposed jury instructions on voluntary manslaughter, involuntary manslaughter, and reckless homicide. The court stated that anger alone is not sufficient to support an instruction on sudden heat and that this is especially true when the words at issue are not intentionally designed to provoke the defendant. The court stated there was nothing Bacsa did that was designed to provoke Walker. The court further stated there was no evidence of recklessness. It noted that Walker bludgeoned Bacsa and went back and bludgeoned him some more and stated it did not know where the serious evidentiary dispute arose. The court declined to give Walker's proposed instructions and instructed the jury on his insanity defense. The jury found

Walker guilty but mentally ill of murder, and the court sentenced him to forty-five years.

### *Discussion*

[11]    The issue is whether the trial court abused its discretion in not giving Walker's proposed instructions on voluntary manslaughter, involuntary manslaughter, and reckless homicide to the jury.  Walker argues that "[w]e should judge [his] actions in the backdrop of his mental illness" and that "[e]ven for a criminal, this is bizarre behavior."  Appellant's Brief at 8.  He argues the voluntary manslaughter instruction should have been given in light of his mental health and that Bacsa's actions of being intoxicated and cursing constituted provocation.  He contends the court should have given the instruction on involuntary manslaughter "since it should have been within the jury's preview [sic] to determine whether [he] meant to harm Bacsa, or meant to kill him."  *Id*. He also argues the court should have given the instruction on reckless homicide "since there was an evidentiary dispute as to whether [he] acted recklessly, or acted so as to knowingly kill Bacsa."  *Id*.

[12]    The State maintains that the trial court properly rejected the proposed instructions.  With respect to the proposed instruction on voluntary manslaughter, the State argues "[b]eing in the presence of a person who is intoxicated and talking to himself out loud using profanity does not make an ordinary person so angry as to render him incapable of reflection," "[t]he fact that [Walker's] mental illness may have made him subjectively more easily frustrated or aggravated by this behavior than the ordinary person would be

does not matter," and there was no provoking conduct sufficient to constitute sudden heat. Appellee's Brief at 14. With respect to the proposed involuntary manslaughter instruction, the State cites to *Champlain v. State*, 681 N.E.2d 696 (Ind. 1997), and argues that the charging information does not contain any reference to a battery. The State also argues the court properly concluded there was no serious evidentiary dispute as to whether Walker acted knowingly when he killed Bacsa and thus the court properly refused to give an instruction on reckless homicide.

[13] We apply a three-step analysis in determining whether a defendant was entitled to an instruction on a lesser-included offense. *See Wright v. State*, 658 N.E.2d 563, 566-567 (Ind. 1995). We must determine: whether the lesser-included offense is inherently included in the crime charged; if not, whether the lesser-included offense is factually included in the crime charged; and if either, whether there is a serious evidentiary dispute whereby the jury could conclude the lesser offense was committed but not the greater offense. *Id.* If a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense. *Id.* at 567. When the trial court makes a finding that a serious evidentiary dispute does not exist, we will review that finding for an abuse of discretion. *Brown v. State*, 703 N.E.2d 1010, 1019 (Ind. 1998).

[14] A person commits murder when the person knowingly or intentionally kills another human being. Ind. Code § 35-42-1-1. A person commits voluntary

manslaughter when the person knowingly or intentionally kills another human being "while acting under sudden heat." Ind. Code § 35-42-1-3(a). Sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter. Ind. Code § 35-42-1-3(b). "Sudden heat occurs when a defendant is provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection." *Conner v. State*, 829 N.E.2d 21, 24 (Ind. 2005). "[N]either mere words nor anger, without more, provide sufficient provocation." *Id.* Also, sudden heat can be negated by a showing that a sufficient "cooling off period" elapsed between the provocation and the homicide. *Morrison v. State*, 588 N.E.2d 527, 531-532 (Ind. Ct. App. 1992). Voluntary manslaughter is inherently included in murder. *Horan v. State*, 682 N.E.2d 502, 507 (Ind. 1997), *reh'g denied*.

[15] The evidence presented reveals that Walker became aggravated with Bacsa and that Bacsa was intoxicated and talking loudly. According to Walker, Bacsa was minding his own business and directing his comments and obscenities to his dead relatives. Walker was upset with Bacsa for being intoxicated, yelling, and cursing, and had been upset with him regarding his hygiene. Walker went into the living room, pushed Bacsa from a chair to the floor, and using his heel stomped on Bacsa's face. Walker testified that, at that point, he "tried to refrain" and "backed off for a minute," but that was when he decided to pick up a chair, and he resumed his vicious attack. Transcript Volume 1 at 224. He struck Bacsa, who was unconscious, with two chairs and then, using his foot,

again stomped on Bacsa, this time between his waist and rib cage. Walker removed Bacsa's clothes, dragged him into the bathroom, and again struck him. Walker referred to his attack as "violent." Transcript Volume 2 at 4. The photographic evidence depicts Bacsa's various injuries as well as the scene of the assault and chairs used to strike him. Bacsa suffered numerous fractured ribs, a punctured lung, and bleeding around his brain and died as a result of the blunt force trauma injuries. To the extent the evidence shows that Walker was angry with Bacsa, we note that anger without more does not provide sufficient provocation. *See Conner*, 829 N.E.2d at 24. Further, Walker's testimony reveals that he did not believe Bacsa was directing his comments toward him. Walker does not point to actions of Bacsa which could constitute provocation to a degree sufficient to render him incapable of reflection. Based upon the record, we conclude that there was no serious evidentiary dispute regarding whether Walker committed the offense causing the death of Bacsa while acting in sudden heat. The trial court did not abuse its discretion in declining to give Walker's proposed instruction on voluntary manslaughter. *See Collins v. State*, 873 N.E.2d 149, 159-160 (Ind. Ct. App. 2007) (noting that anger alone is not sufficient to support an instruction on sudden heat), *trans. denied*.

[16] Walker also claims the trial court should have given involuntary manslaughter and reckless homicide instructions, but he does not develop an argument on appeal or point to the evidence which he believes presents serious evidentiary disputes as to those offenses. Accordingly, Walker has waived his claims as to those instructions. *See Cooper v. State*, 854 N.E.2d 831, 834 n.1 (Ind. 2006)

(holding the defendant's contention was waived because it was not supported by cogent argument). We find that, waiver notwithstanding, reversal is not required.

[17] As for the proposed instruction on involuntary manslaughter, Ind. Code § 35-42-1-4 provides that a person who kills another human being "while committing or attempting to commit: (1) a Level 5 or Level 6 felony that inherently poses a risk of serious bodily injury; (2) a Class A misdemeanor that inherently poses a risk of serious bodily injury; or (3) battery; commits involuntary manslaughter, a Level 5 felony." Involuntary manslaughter is not an inherently included lesser offense of murder, but it may be a factually included lesser offense if the charging instrument alleges that a battery accomplished the killing. *Wilson v. State*, 765 N.E.2d 1265, 1271 (Ind. 2002). The only element distinguishing murder from involuntary manslaughter is what the defendant intended to do—batter or kill. *Id.* We observe that the charging instrument did not allege that a battery accomplished the killing.[1] Moreover, the record reveals that Walker stomped on Bacsa, rendering him unconscious, backed off for a minute, then resumed his attack by striking him with two chairs, stomping on him again, and striking him with his hand. When asked if he was aware of the high probability he was killing Bacsa, Walker stated "Yes, I realized that; I was," Transcript Volume 1 at 248, and when asked if he knew he was killing Bacsa, he stated "I

---

[1] The State's charging information for murder alleged that Walker "did knowingly kill another human being, to-wit: Ronald L Bacsa." Appellant's Appendix Volume 2 at 109.

possibly could have been knowing that I was killing him . . . due to the fact that it was violent." Transcript Volume 2 at 4. Based upon the degree of the assault together with Walker's admissions regarding his intent, we conclude that there was no serious evidentiary dispute regarding whether Walker intended to commit only battery or another offense referenced in Ind. Code § 35-42-1-4. The trial court did not abuse its discretion in declining to give Walker's proposed instruction on involuntary manslaughter. *See Wilson*, 765 N.E.2d at 1267-1272 (holding the evidence did not raise a serious evidentiary dispute as to whether the killing was done knowingly and the trial court did not abuse its discretion in denying the defendant's tendered involuntary manslaughter instruction where the defendant beat the victim to the point of unconsciousness, the victim died by blunt force trauma, and the defendant had stated that the victim was alive so he "had to take her out of it"); *Champlain v. State*, 681 N.E.2d 696, 702 (Ind. 1997) (holding that, because the charging instrument did not assert a battery accomplished the killing, the trial court did not err in declining to give an involuntary manslaughter instruction).

[18] Reckless homicide is an inherently included lesser offense of murder, as the only element distinguishing the two is the requisite culpability. *See Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); *Miller v. State*, 720 N.E.2d 696, 702 (Ind. 1999). A person engages in conduct "'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so," whereas a person engages in conduct "'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the

disregard involves a substantial deviation from acceptable standards of conduct." *See* Ind. Code § 35-41-2-2. The Indiana Supreme Court has held that "a trial court does not err when it refuses to instruct the jury as to a lesser-included offense in a prosecution for murder where the defense of insanity is used to disprove intent to commit the greater offense" and that, "[w]hile [a defendant] would be entitled to a lesser included instruction if a serious evidentiary dispute existed about the level of his mens rea, his interposition of the insanity offense does not by itself raise such a dispute." *Wilson v. State*, 697 N.E.2d 466, 475 (Ind. 1998) (citations omitted) (holding that, "[b]ecause the insanity defense is the sole cause proffered by Wilson as to why a serious evidentiary dispute existed between murder and reckless homicide, and that argument is misplaced, we conclude the trial court correctly refused Wilson's instructions on reckless homicide.").

[19] Walker engaged in a vicious and prolonged attack on Bacsa because he was aggravated with him. At one point during the attack, Walker refrained for a moment but then resumed his attack. There is no evidence that Walker stomped his heel or swung the chairs or his hand at random. The attack caused extensive injuries to Bacsa resulting in his death. The trial court did not abuse its discretion in declining to give Walker's proposed instruction on reckless homicide. *See Dearman v. State*, 743 N.E.2d 757, 760 (Ind. 2001) (holding there was no serious evidentiary dispute to support giving an instruction for reckless homicide where the defendant struck the victim in the head twice with a concrete block); *Lyttle v. State*, 709 N.E.2d 1, 3 (Ind. 1999) (holding the trial

court did not abuse its discretion by denying a requested reckless homicide instruction where the defendant struck the victim in the head several times with a baseball bat); *Sanders v. State*, 704 N.E.2d 119, 122 (Ind. 1999) (holding "[t]here is no evidence that [the defendant] was shooting at the crowd on the stairs at random; rather, he shot only at" the victim and the defendant was not entitled to an instruction on reckless homicide); *McDowell v. State*, 102 N.E.3d 924, 933 (Ind. Ct. App. 2018) (noting that, in certain cases, "there was a relatively brief act that resulted in the victim's death (shooting a gun that might have been loaded, playing around with a handgun, striking a small child with a paddle, squeezing a small child's neck during play)" and that these actions could have been performed recklessly, but that "[i]n contrast, the evidence here shows that Rachel was subject to an extensive beating, not a momentary action, such that there is no way that McDowell could have acted merely recklessly without also acting knowingly"), *trans. denied*. The trial court did not abuse its discretion in refusing Walker's proposed instructions.

## Conclusion

[20] For the foregoing reasons, we affirm Walker's conviction for murder.

[21] Affirmed.

Altice, J., and Tavitas, J., concur.